## No. 25-10489

# United States Court of Appeals
# for the Fifth Circuit

Porch.com,

*Plaintiff-Appellant*

v.

Gallagher Re, Incorporated, formerly known as Willis Re,

*Defendant-Appellee*

On Appeal from the United States District Court
for the Northern District of Texas
3:24-CV-1475

## BRIEF OF APPELLANT PORCH.COM

Stephen E. Morrissey
Kemper P. Diehl
Susman Godfrey LLP
401 Union Street, Suite 3000
Seattle, WA 98101

Allen J. Hernandez
Daniel Wilson
Susman Godfrey LLP
1000 Louisiana St., Suite 5100
Houston, TX 77002

***ORAL ARGUMENT
REQUESTED***

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellee | Counsel for Appellee |
| --- | --- |
| Gallagher Re, Inc. | Deanne Ayers,<br>Ayers & Ayers (Colleyville, TX) |

| Appellant | Counsel for Appellant |
| --- | --- |
| Porch.com, Inc. | Allen J. Hernandez and Daniel Wilson, Susman Godfrey LLP (Houston, TX);<br><br>Stephen E. Morrissey and Kemper Diehl, Susman Godfrey LLP (Seattle, WA) |

| Other Interested Parties | Counsel for Interested Parties |
| --- | --- |
| Porch Group, Inc. | Susman Godfrey LLP |
| Homeowners of America Insurance Co. | Susman Godfrey LLP |
| Homeowners of America Holding Corp. | Susman Godfrey LLP |
| Arthur J. Gallagher & Co. | Ayers & Ayers |

*/s/ Stephen E. Morrissey*
Attorney of record for Appellant

ii

# STATEMENT REGARDING ORAL ARGUMENT

Appellant Porch.com, Inc. respectfully requests oral argument. Appellant submits that oral argument would aid in the resolution of the legal questions raised in this appeal, which include issues of commercial contract interpretation and Rule 12(b)(6) dismissal standards.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................... vii

STATEMENT OF THE ISSUES ............................................................. viii

INTRODUCTION ..................................................................................... 1

STATEMENT OF THE CASE .................................................................. 4

    I.    Factual Background ..................................................................... 4

    II.    Proceedings Below ..................................................................... 10

SUMMARY OF THE ARGUMENT ...................................................... 12

ARGUMENT .......................................................................................... 14

    I.    The district court erred in holding as a matter of law that Gallagher did not breach the RIAA. ................................................................... 14

        A.   Gallagher breached section 13 of the RIAA. .................................. 16

        B.   Gallagher breached section 11 of the RIAA. .................................. 18

        C.   Gallagher breached section 5 of the RIAA. ................................... 24

    II.    The district court erred in *sua sponte* denying Porch leave to amend. ....... 31

CONCLUSION ....................................................................................... 33

CERTIFICATE OF SERVICE ............................................................... 34

CERTIFICATE OF COMPLIANCE ...................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................15

*Bernard v. L.S.S. Corp.*,
  532 S.W.2d 409 (Tex. App.—Austin 1976, writ ref'd n.r.e.) ....................23, 24

*Coker v. Coker*,
  650 S.W.2d 391 (Tex. 1983) ...............................................................15

*Decorative Ctr. of Hous., L.P. v. Direct Response Publ'ns, Inc.*,
  208 F. Supp. 2d 719 (S.D. Tex. 2002) ...................................................30

*Gonzalez v. Kay*,
  577 F.3d 600 (5th Cir. 2009) ..............................................................29

*Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*,
  313 F.3d 305 (5th Cir. 2002) .........................................................31, 32

*Hancock v. Chi. Title Ins.*,
  No. 07-CV-1441, 2013 WL 139547 (N.D. Tex. Jan. 11, 2013)..................23, 24

*Hellenic Inv., Inc. v. Kroger Co.*,
  766 S.W.2d 861 (Tex. App.—Houston [1st Dist.] 1989, no writ) ....................18

*Herrmann Holdings Ltd. v. Lucent Techs. Inc.*,
  302 F.3d 552 (5th Cir. 2002) ..............................................................31

*J.M. Davidson, Inc. v. Webster*,
  128 S.W.3d 223 (Tex. 2003) ...............................................15, 16, 27

*May v. United Servs. Ass'n of Am.*,
  844 S.W.2d 666 (Tex. 1992) .........................................10, 19, 20, 24

*Mitchell v. State Farm Fire & Cas. Co.*,
  954 F.3d 700 (5th Cir. 2020) ..............................................................15

*Molzan v. Bellagreen Holdings, L.L.C.*,
    112 F.4th 323 (5th Cir. 2024) ........................................................15, 16, 18, 30

*Pharr-San Juan-Alamo Indep. Sch. Dist. v. Texas Pol. Subdivisions*
    *Prop./Cas. Joint Self Ins. Fund*,
    642 S.W.3d 466 (Tex. 2022) ...............................................................................26

*Quantum Plus, LLC v. Hosp. Internists of Austin, P.A.*,
    No. 03-23-00263-CV, 2025 WL 420213 (Tex. App.—Austin Feb.
    7, 2025, no pet.) ...........................................................................................22, 24

*R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*,
    596 S.W.2d 517 (Tex. 1980) ...............................................................................30

*Republic Waste Servs. of Texas, Ltd. v. Texas Disposal Sys., Inc.*,
    848 F.3d 342 (5th Cir. 2016) ...............................................................................14

*Stellar Restoration Servs., LLC v. James Christopher Courtney*,
    533 F. Supp. 3d 394 (E.D. Tex. 2021)............................................................22, 30

**Statutes**

Tex. Ins. Code § 4152.152 ........................................................................10, 19, 20

**Other Authorities**

Black's Law Dictionary (12th ed. 2024) ............................................................25, 26

FED. R. CIV. P. 15(a)(2) ........................................................................................31

FED. R. CIV. P. 12(b)(6).................................................................................*passim*

FED. R. CIV. P. 12(b)(7).........................................................................................11

# JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291, as this is an appeal from a district court's final judgment that disposed of all parties and claims.  Final judgment was entered on March 31, 2025, and Appellant filed its notice of appeal on April 4, 2025.

# STATEMENT OF THE ISSUES

1.  Did the district court err in dismissing Porch's claim that Gallagher breached sections 5, 11, and 13 of the parties' contract?

2.  Did the district court err in *sua sponte* denying Porch even one opportunity to amend its complaint?

# INTRODUCTION

Homeowners of America Insurance Company ("HOA") is a property and casualty insurance company that fell victim to a sweeping international fraud that roiled the insurance industry in 2023.[1] The fraudulent scheme worked on HOA only because HOA's reinsurance broker, Gallagher Re, Inc. ("Gallagher"), failed miserably in its brokerage role. Gallagher violated multiple contract provisions meant to safeguard HOA—both when Gallagher initially procured for HOA reinsurance that turned out to be wholly illusory and when Gallagher permitted bad actors to steal $25 million from HOA's reinsurance facility while Gallagher was administering it.

In a 2017 contract, the Reinsurance Intermediary Authorization Agreement ("RIAA"), HOA tasked Gallagher with securing a "reinsurance" policy for HOA, under which HOA's own coverage obligations (as a primary insurer to homeowners), would be separately insured so that it (as an insured), would be protected if it faced a mass claims event.  Under the RIAA, Gallagher, as HOA's reinsurance broker, was obligated to conduct appropriate diligence in securing collateral to back HOA's multi-hundred-million-dollar reinsurance policy and to perform industry-standard administrative services in connection with the

---

[1] Appellant Porch.com, Inc. ("Porch") brought this action on behalf of its wholly owned subsidiaries, HOA and Homeowners of America Holding Corporation ("HOAHC").

reinsurance once it was in place. For example, when procuring reinsurance, Gallagher was required to secure written evidence directly from any reinsuring entity, confirming that the entity agreed to assume the financial risk it had undertaken in the transaction. Gallagher was also required to comply with applicable economic laws, including its duty under Texas law to exercise diligence in attempting to place the policy and to inform the insured if unable to do so, as well as its duties under the Texas Insurance Code to inquire into the financial condition of the reinsurer and share its findings with HOA. Gallagher was also required to administer HOA's reserve funding after placement of the policy.

As it turned out, Gallagher did none of these things. It conducted no diligence into the financial institution purportedly underwriting the risk in HOA's reinsurance policy, turned a blind eye to multiple red flags that emerged amid its rushed transaction process, and even authorized the release of $25 million of HOA's money at the fraudsters' request while administering the reserve funding of HOA's reinsurance facility. Because of its extensive malfeasance, Gallagher failed to discern that HOA's three-hundred-million-dollar reinsurance policy was not backed by *any real collateral at all*. The collateral that purported to secure it—supposed letters of credit from China Construction Bank—was a fraud, meaning HOA's reinsurance coverage was completely illusory.

It was not until July 2023, when headlines broke the news that letters of credit backing major reinsurance policies were fraudulent, that HOA learned it was a victim of the scheme. Only then did it discover that Gallagher, as its broker, had fumbled the ball at every turn, breaching multiple provisions of the RIAA in the process.

In 2024, Porch filed this lawsuit against Gallagher, seeking to recover the massive losses it incurred as a result of Gallagher's breaches of contract. Gallagher moved to dismiss Porch's complaint, trying to evade discovery into its professional failures. On March 31, 2025, the district court granted Gallagher's motion without holding oral argument and *sua sponte* denied Porch even one opportunity to amend its complaint. The court swiftly entered final judgment that same day and closed the case.

The district court erred. Its ruling runs afoul of fundamental 12(b)(6) principles, as it repeatedly resolved inferences and fact disputes in favor of Gallagher and ignored Porch's most significant factual allegations. The court also erred in its interpretation of the parties' contract. It consistently read the RIAA to require as little of Gallagher as possible, uniformly adopting Gallagher's preferred readings, discounting the contract's plain language, and ignoring substantial fact issues required to resolve the multiple ambiguities in the subject provisions. Compounding

these errors, the court *sua sponte* denied Porch the opportunity to amend its complaint, despite that Porch had not once done so.

This Court should reverse on the merits, as Porch has adequately alleged that Gallagher breached three distinct provisions of the RIAA. Minimally, the Court should reverse the district court's denial of leave to amend so Porch can have at least *one* opportunity to amend its complaint and resolve any deficiencies.

## STATEMENT OF THE CASE

### I.    Factual Background

HOA is a property and casualty insurance company. *See* ROA.35 (Plaintiff's Original Petition ("Pet.") ¶ 22). Insurers like HOA often obtain "reinsurance" coverage to manage their risks and mitigate against potential losses from major claims events. ROA.35 (Pet. ¶ 23). In November 2017, HOA entered into the RIAA with Gallagher Re, then known as "Willis Re."[2] ROA.35–36 (Pet. ¶¶ 24, 26.) The RIAA authorizes Gallagher to "procure and administer reinsurance" on HOA's behalf and imposes a series of contractual obligations owed in its capacity as HOA's reinsurance broker. *See* ROA.35 (Pet. ¶ 24). Specifically, under the RIAA, Gallagher was obligated to (1) provide industry-standard "Administrative Services" after placing the reinsurance, including administering reserve funding, (2) comply with applicable economic laws, and (3) retain documentation "[d]irectly" from any

---

[2] All references to "Willis Re" refer to Gallagher Re, and vice versa. *See* Pet. ¶¶ 13, 26.

assuming reinsurer indicating that the reinsurer agreed to assume the reinsurance risk. *See* ROA.50–61 (Pet. ¶¶ 73–80, 90–94; Pet. Ex. A at 1–2 §§ 5, 11 & 13).

In late 2021, HOA turned to Gallagher to secure a new reinsurance contract to keep up with HOA's growth. ROA.36 (Pet. ¶¶ 27–28). Because its existing reinsurance contracts would expire on December 31, 2021, HOA needed the reinsurance coverage to be secured by no later than January 1, 2022, or else risk a lapse in coverage. ROA.36 (Pet. ¶ 27). Allen Cashin, an Executive Vice President in Gallagher Re's business division, led the transaction. ROA.37 (Pet. ¶ 29).

Gallagher introduced HOA to Vesttoo, an Israeli start-up and self-described "insurance marketplace." ROA.37 (Pet. ¶ 30). Vesttoo proposed a specialized reinsurance vehicle arranged through the White Rock Group ("White Rock"), a subsidiary of Aon plc, which is an international insurance company. ROA.37 (Pet. ¶ 32).

Gallagher's work with Vesttoo quickly raised red flags uniquely visible to Gallagher. For example, Vesttoo refused to complete Gallagher's standard "Know Your Customer" process and rejected Gallagher's offer to use its own business unit to arrange the reinsurance transaction, instead insisting on using White Rock. ROA.37 (Pet. ¶ 33). Despite early warning signs like these and others, Gallagher conducted no further diligence and proceeded to engage Vesttoo and White Rock to

set up a "quota share reinsurance contract" ("QSRC") for HOA. ROA.37–38 (Pet. ¶¶ 33–34).

Under the QSRC, HOA's reinsurance would be administered through a "segregated account," which would receive a portion of the premiums paid to HOA by policyholders and would pay out to cover HOA's losses under certain circumstances. ROA.38 (Pet. ¶ 37). To ensure that the reinsurance was backed by sufficient funds, a third-party bank would issue a letter of credit guaranteeing the availability of over $200 million in the segregated account that HOA could draw from to pay out claims. ROA.38, 50–51 (Pet. ¶¶ 37, 75). As such, "the viability of this reinsurance arrangement hinged on obtaining a valid letter of credit from a trustworthy bank because that bank would guaranty the payment of reinsurance funds in the event of a major claims event." ROA.39 (Pet. ¶ 38).

Gallagher, through Cashin, waited until the last minute to secure HOA's reinsurance. On December 27, 2021, four days before the deadline, Cashin sent HOA a draft QSRC containing a template for a letter of credit—but no actual letter of credit. ROA.39 (Pet. ¶ 41). In the draft, Vesttoo and White Rock indicated that the third-party bank would be China Construction Bank ("CCB"). ROA.39 (Pet. ¶ 41). Evidently concerned about relying on CCB for the letter of credit, Cashin attempted to replace CCB with HSBC Bank USA by editing the document, *see*

6

ROA.39–40 (Pet. ¶ 42)—but Cashin did not alert HOA to the issue and conducted no further diligence on CCB, Vesttoo, or White Rock.  ROA.40 (Pet. ¶¶ 43–44).

Then, with only twelve hours to go before the deadline, White Rock sent Cashin a document titled "Signed LOC."  ROA.40–41 (Pet. ¶ 46).  But the document was not a letter of credit, nor was it from CCB—or any other known bank.  The document identified itself as a "collateral letter" from an entity called "Yu Po Finance Ltd," and was signed and "approved" by a "Xu Yingde," a purported Senior VP at CCB.  ROA.40 (Pet. ¶ 46).  The letter represented that Yu Po Finance would, at some unspecified time, provide a letter of credit issued by CCB.  ROA.41 (Pet. ¶ 46).  With the New Year's deadline fast approaching, and following Cashin's urging that HOA proceed with the deal, HOA had little choice but to accept the proposed transaction.  ROA.42–43 (Pet. ¶¶ 49–53).

When the deadline hit, Gallagher had again fallen short.  Contrary to HOA's understanding, the final transaction did *not* include a letter of credit.  ROA.43 (Pet. ¶ 55).  It contained only the "collateral letter" from "Yu Po Finance."  ROA.43 (Pet. ¶ 56).  Accordingly, as HOA would later learn, the segregated account to which HOA would look for reinsurance had ***no collateral***.  ROA.43–44 (Pet. ¶ 56).  There was no letter of credit—just a letter from "Yu Po Finance" promising one.  ROA.43–44 (Pet. ¶ 56).  Having collected millions of dollars in fees from HOA, Gallagher had left HOA without any actual reinsurance coverage at all.  ROA.43–44 (Pet.

¶ 56). Worse, Cashin affirmatively assured HOA that it had a valid letter of credit, referring to the letter from Yu Po as "the CCB LOC." ROA.44 (Pet. ¶¶ 57–58).

In the days that followed, Gallagher attempted to cover its tracks. Gallagher sent HOA a boilerplate form titled "Willis Re Disclosure Regarding Collateralized Reinsurance" (the "Disclosure Form"), which purported to disclaim Gallagher's responsibility for conducting certain types of diligence related to the transaction Gallagher had already arranged and finalized. ROA.45 (Pet. ¶ 61). The Disclosure Form assumes a client will be informed of its disclosures and sign it **before** a transaction is entered, stating: "If you wish us to proceed to place this policy/contract with the above Reinsurer, please indicate by signing this authorization." ROA.169. But Gallagher did not obtain HOA's authorization to "proceed to place" at any time before it placed HOA's reinsurance contract. HOA only signed the Disclosure Form on January 3, 2022, **after** the Vesttoo transaction was already complete. ROA.46 (Pet. ¶ 64).

Gallagher's professional lapses continued throughout 2022. Most notably, in providing its contractually required administrative services as HOA's reinsurance broker, Gallagher informed HOA that, to "offer their investors liquidity," Vesttoo sought to withdraw $25 million from the segregated account—money HOA had placed in the account from its policyholders' premiums. ROA.47–48 (Pet. ¶ 68). When HOA asked Gallagher whether the account was sufficiently capitalized to

permit such a large withdrawal, Cashin falsely told HOA that "Treaty Year 2022 still has the $228M LOC as received by HOA, thus the contract is funded to the contract limit and meets Schedule F requirements." ROA.47–48 (Pet. ¶ 68). Based on these false assurances, HOA allowed Gallagher to authorize the withdrawal. ROA.30–31, 47–48, 52–53 (Pet. ¶¶ 5, 9, 68, 80). Gallagher thus sent $25 million of HOA's money out the door and into the pockets of fraudsters. ROA.30–31, 47–48, 52–53 (Pet. ¶¶ 5, 9, 68, 80).

Gallagher ignored more red flags in renewing HOA's reinsurance coverage for the upcoming calendar year, 2023. When Cashin received the letter of credit for 2023, it bore no resemblance to the "collateral letter" from Yu Po Finance for 2022. ROA.48 (Pet. ¶ 70). The letter was on CCB letterhead and purported to be from CCB's New York branch. ROA.48–49 (Pet. ¶ 70). It affirmatively stated it was a "clean, irrevocable, and unconditional Standby Letter of Credit." ROA.48–49 (Pet. ¶ 70). Despite the blatant discrepancies between the 2022 "collateral letter" from "Yu Po Finance" and the 2023 letter of credit, Gallagher conducted no further diligence. ROA.49–50 (Pet. ¶¶ 71–72).

In July 2023, news broke that letters of credit issued as part of Vesttoo transactions were invalid. ROA.53 (Pet. ¶ 81). When HOA contacted CCB directly to confirm the validity of its letter of credit—something Gallagher should have done a long time prior, pursuant to the RIAA—CCB denied that it had ever issued the

letter. ROA.53 (Pet. ¶ 81). Only then did HOA discover what had been true all along: Gallagher had never secured any reinsurance coverage at all. ROA.30, 43–44 (Pet. ¶¶ 5, 56). The segregated account held only HOA's own money. ROA.30 (Pet. ¶ 5).

## II.    Proceedings Below

On May 8, 2024, Plaintiff filed suit in Dallas County District Court, alleging that Gallagher breached the RIAA, ROA.55–57 (Pet. ¶¶ 88–96), and seeking damages for its massive losses, ROA.53–55 (Pet. ¶¶ 82–87). Porch alleged that Gallagher breached three distinct provisions of the RIAA:

- **Section 13**, requiring Gallagher to provide "Administrative Services," meaning "all servicing duties customarily performed by a reinsurance intermediary-broker after the placement of the reinsurance contract," which included, *inter alia*, "administering all reserve funding." ROA.52 (Pet. ¶ 79). Gallagher breached this obligation when it, for example, authorized a $25 million release of HOA's funds to the fraudsters and, in doing so, failed to perform the servicing duties customarily performed by reinsurance intermediary-brokers. ROA.52–53 (Pet. ¶ 80).

- **Section 11**, requiring Gallagher to comply with "applicable economic . . . laws." ROA.51 (Pet. ¶ 78). Gallagher breached this obligation when it violated its common-law duty to "use reasonable diligence in attempting to place the requested reinsurance and to inform the client promptly if unable to do so." *May v. United Servs. Ass'n of Am.*, 844 S.W.2d 666, 669 (Tex. 1992); ROA.51–52 (Pet. ¶ 78). Gallagher further breached this obligation when it violated the Texas Insurance Code's requirement that Gallagher "exercise due diligence in inquiring into the financial condition of the reinsurer" and "disclose to the ceding insurer the broker's findings in connection with the

inquiry." Tex. Ins. Code § 4152.152(1)-(2); ROA.51–52 (Pet. ¶ 78).

- **Section 5**, requiring Gallagher to "[r]etain . . . [d]irectly from any assuming reinsurer, written evidence that the assuming reinsurer has agreed to assume the risk." ROA.50 (Pet. ¶ 74). Gallagher breached this obligation when it failed to obtain and retain any written evidence that China Construction Bank agreed to assume the risk, and instead secured only a fraudulent collateral letter and falsified letter of credit. ROA.50–51 (Pet. ¶¶ 75–77).

On June 14, 2024, Gallagher removed the case from Dallas County to the United States District Court for the Northern District of Texas. ROA.7–19. On June 21, 2024, Gallagher filed a motion to dismiss Porch's complaint under Rule 12(b)(6) for failure to state a claim. ROA.148–58. Gallagher also moved to dismiss under Rule 12(b)(7) for failure to join necessary parties. ROA.158–61. Porch opposed the motion, demonstrating that its complaint adequately alleged that Gallagher's malfeasance amounted to breach of three distinct provisions in the parties' contract. ROA.576–90. Porch also showed that Gallagher's 12(b)(7) arguments were baseless. ROA.590–95.

On March 31, 2025, the district court entered an order granting Gallagher's motion to dismiss under Rule 12(b)(6) and denying as moot its motion under Rule 12(b)(7). ROA.648–72. The court also ruled, *sua sponte*, that Porch may not amend its complaint because Porch had "stood on its pleadings" in opposing Gallagher's motion. ROA.672–74. The court immediately entered final judgment and closed the case that same day. ROA.675. Porch appealed. ROA.677–79.

11

# SUMMARY OF THE ARGUMENT

The district court erred in granting Gallagher's motion to dismiss under Rule 12(b)(6), holding as a matter of law that Gallagher's failures did not amount to a breach of the RIAA.

*First*, Porch adequately alleged that Gallagher breached section 13 of the RIAA, which required Gallagher to "[p]rovide 'Administrative Services,' . . . in connection with reinsurance contracts placed by Willis Re." ROA.61 (Pet. Ex. A at 2 § 13); ROA.52–56 (Pet. ¶¶ 79–80, 94). Under the contract, "Administrative Services" include "all servicing duties customarily performed by a reinsurance intermediary-broker ***after*** the placement of the reinsurance contract," which "includ[e] but [are] not limited to . . . administering all reserve funding." ROA.61 (Pet. Ex. A at 2 (emphasis added)). The district court reasoned that this section requires Gallagher to perform certain duties *after* placement of the reinsurance contract but asserted that "Porch's allegations with respect to [section 13] focus on Gallagher's alleged failures *in the placement* of reinsurance." ROA.671 (emphasis added)). This is wrong. Porch's most significant alleged breach of section 13 is that Gallagher authorized the release of ***$25 million*** to the fraudsters, ***after*** placement of the reinsurance. ROA.30–31, 47–48, 52–53 (Pet. ¶¶ 5, 9, 68, 80). Under the court's own reasoning, Gallagher committed a plain breach of section 13, and reversal is warranted.

*Second*, Porch adequately alleged that Gallagher breached section 11 of the RIAA, which required Gallagher to comply with applicable "economic or trade sanctions laws." ROA.61 (Pet. Ex. A at 2 § 11); ROA.51–52, 55–56 (Pet. ¶¶ 78, 93). "[E]conomic" laws include Texas insurance laws, which obligate reinsurance brokers like Gallagher to (1) use reasonable diligence in attempting to place the requested insurance and promptly inform the client if unable to do so, and to (2) exercise due diligence in inquiring into the financial condition of the reinsurer and disclose its findings to the ceding insurer. ROA.30–31, 51–52 (Pet. ¶¶ 6–8, 78). Gallagher did none of those things. *E.g.*, ROA.37–52, 55–56 (Pet. ¶¶ 31, 33, 40, 46–48, 54–72, 78, 93). Ruling on the meaning of the contract term as a matter of law, the district court freed Gallagher of any such obligations, holding that "economic" laws do not include Texas insurance laws, thus allowing Gallagher to flout its core professional duties as a Texas insurance broker. ROA.668. The court also failed to address Gallagher's distinct duties under the Texas common law.

*Third*, Porch adequately alleged that Gallagher breached section 5 of the RIAA, which required Gallagher to "[r]etain . . . [d]irectly from any assuming reinsurer, written evidence that the assuming reinsurer has agreed to assume the risk." ROA.60 (Pet. Ex. A at 1 § 5 (emphasis added)); *see* ROA.50–51, 55 (Pet. ¶¶ 74–77, 92). To evade the undisputed fact that it did not do this, Gallagher reads this provision to exclude any obligation to *obtain* any such evidence in the first place.

13

ROA.149–51; ROA.599–602.  Gallagher's reading does not pass muster; one cannot "retain" something "directly from" another without *obtaining* it in the first place. Gallagher also contends that "any assuming reinsurer" cannot include CCB, despite that CCB's entire role in the transaction was to assume the reinsurance risk. ROA.150–51; ROA.600–02.  Regardless, even if reasonable minds could differ on the meaning of "retain" and "any assuming reinsurer," the result is an ambiguity that the factfinder must resolve.  The district court erred by resolving these ambiguities against Porch as the nonmovant at the 12(b)(6) stage.  ROA.664–66.

Finally, even if Porch's complaint were deficient in the ways the court identified, the court independently erred in denying Porch leave to file even one amended complaint.  ROA.672–73.  The Federal Rules are clear that leave to amend should be freely granted, especially here, where Porch had not once amended its complaint, and where the district court ruled against Porch based on verbiage in the complaint that Porch could readily amend.

This Court should reverse in full and remand for further proceedings.

## ARGUMENT

### I.    The district court erred in holding as a matter of law that Gallagher did not breach the RIAA.

A district court's dismissal under Rule 12(b)(6) is reviewed de novo.  *Republic Waste Servs. of Texas, Ltd. v. Texas Disposal Sys., Inc.*, 848 F.3d 342, 344 (5th Cir.

2016). A complaint should not be dismissed if it states "a claim to relief that is plausible on its face." *Mitchell v. State Farm Fire & Cas. Co.*, 954 F.3d 700, 705 (5th Cir. 2020) (citation omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must "accept all well-pleaded facts as true and draw all reasonable inferences in favor of the nonmoving party." *Molzan v. Bellagreen Holdings, L.L.C.*, 112 F.4th 323, 331 (5th Cir. 2024) (citation omitted).

Under Texas law,[3] courts interpreting a contract seek to "ascertain the true intentions of the parties as expressed in the instrument." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) (citation omitted). A "breach occurs when a party fails to perform a duty required by the contract." *Molzan*, 112 F.4th at 335 (quoting *Hoover v. Gregory*, 835 S.W.2d 668, 677 (Tex. App.—Dallas 1992, writ denied)).

If a contract is "so worded that it can be given a certain or definite legal meaning or interpretation, then . . . the court will construe the contract as a matter of law." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). "On the other hand, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the

---

[3] There is no dispute that Texas law governs the substantive contract issues in this case.

parties' intent," *see J.M. Davidson*, 128 S.W.3d at 229 (citation omitted), which precludes dismissal on the pleadings, *see Molzan*, 112 F.4th at 331, 335.

### A. Gallagher breached section 13 of the RIAA.

The district court erred in ruling that Gallagher did not breach section 13 of the RIAA. Under section 13, Gallagher was obligated to "[p]rovide 'Administrative Services,' . . . in connection with reinsurance contracts placed by Willis Re." ROA.61 (Pet. Ex. A at 2 § 13); *see* ROA.52–56 (Pet. ¶¶ 79–80, 94). "Administrative Services" is defined to include "all servicing duties customarily performed by a reinsurance intermediary-broker *after* the placement of the reinsurance contract, including but not limited to: 1) preparing and handling, through completion of the signing process, reinsurance contracts and any addenda thereto; . . . and 5) administering all reserve funding." ROA.61 (Pet. Ex. A at 2 (emphasis added)).

Gallagher breached section 13 through its malfeasance *after* placing the reinsurance contract. Most notably, after placing the 2022 QSRC, Gallagher falsely "assur[ed] HOA that its reinsurance facility held a valid and reliable letter of credit" and that HOA "could safely permit the withdrawal of $25 million from its segregated account." ROA.52–53 (Pet. ¶ 80). Gallagher thus authorized the withdrawal requested by Vesttoo, sending $25 million of HOA's own funds out the door and into the pockets of the fraudsters. *See* ROA.30–31, 47–48, 52–53 (Pet. ¶¶ 5, 9, 68, 80). This was a stark breach of Gallagher's contractual duty to perform all "servicing

duties" that are "customarily performed by a reinsurance intermediary-broker," including "administering all reserve funding." ROA.61 (Pet. Ex. A at 2).

The district court did not expressly reject this contention. It instead reached its conclusion by overlooking Porch's allegations altogether. The court stated that "Porch's allegations with respect to Gallagher's alleged breaches of [section 13] focus on Gallagher's alleged failures *in the placement* of reinsurance, whereas section 13's definition of 'Administrative Services' clearly applies to 'servicing duties customarily performed by a reinsurance intermediary-broker *after* the placement of the reinsurance contract.'" ROA.671 (first emphasis added).

The district court has this wrong. Porch's alleged breaches of section 13 are not limited to "placement" problems. To the contrary, the most significant breach of section 13—emphasized in Porch's complaint and its opposition to the motion to dismiss—is that Gallagher blindly authorized the release of *$25 million* from HOA's segregated account *after* placement of the reinsurance policy without assuring that the segregated account was adequately funded. *See* ROA.47–48, 52–53, 56 (Pet. ¶¶ 68, 80, 94); ROA. 588–89. Indeed, the court elsewhere acknowledged these allegations, ROA.670, but then ignored them in asserting that Porch did not allege any post-placement misconduct, ROA.671. As the court itself reasoned, section 13 is concerned with post-placement services. Its own rationale should have led it to uphold Porch's claim for breach of section 13.

The district court also stated that it "declines Porch's invitation to consider its allegations regarding Gallagher's allegedly fraudulent conduct in administering the 2022 QSRC." ROA.672. It is unclear what the court meant by this. Porch does not allege a fraud claim against Gallagher. And to the extent the court "decline[d] . . . to consider" Porch's allegations regarding Gallagher's "administering [of] the QSRC," that was a clear error. Section 13 is concerned with precisely that conduct—Gallagher's administration of the QSRC. The court's ruling is unsupportable on any of its asserted grounds.

Accordingly, this Court should reverse the district court's ruling that Porch failed to allege that Gallagher breached section 13 of the RIAA.[4]

## B. Gallagher breached section 11 of the RIAA.

The district court also erred in ruling that Gallagher did not breach section 11 of the RIAA. Under section 11, Gallagher was obligated to "[c]omply with U.S., E.U., U.K., and any other applicable economic or trade sanctions laws." ROA.61

---

[4] Gallagher argued in the district court that its section 13 obligations were only ministerial in nature. ROA.156–58; ROA.607 n.9. While the district court did not adopt this position, Porch reiterates that this contention is baseless. As reflected by Gallagher's gross malfeasance in authorizing a release of $25 million to the fraudsters, the obligation to administer HOA's funding is anything but ministerial. Indeed, the contract itself makes clear that Gallagher must administer the contract by performing the "servicing duties customarily performed by a reinsurance intermediary-broker." ROA.61. The nature and scope of these customary duties is a question of fact that cannot be resolved at the motion to dismiss stage. *See Hellenic Inv., Inc. v. Kroger Co.*, 766 S.W.2d 861, 866 (Tex. App.—Houston [1st Dist.] 1989, no writ) ("[E]vidence of custom or usage, which tends to explain the intent of the parties regarding an ambiguous contract term, is generally admissible to assist the factfinder in ascertaining the parties' true intent."); *Molzan*, 112 F.4th at 331, 335 (holding that the plaintiff's well-pleaded factual allegations preclude 12(b)(6) dismissal of certain claims).

(Pet. Ex. A at 2 § 11); *see* ROA.51–52, 55–56 (Pet. ¶¶ 78, 93).  This unremarkable provision contractually obligated Gallagher to abide by the laws that govern its conduct as a reinsurance broker.  The explicitly referenced "U.S." and "economic" laws include Texas insurance law, both common-law and statutory.  Texas law requires insurers to "use reasonable diligence in attempting to place the requested reinsurance and to inform the client promptly if unable to do so." *See* ROA.51–52 (Pet. ¶ 78); *May v. United Servs. Ass'n of Am.*, 844 S.W.2d 666, 669 (Tex. 1992) ("It is established in Texas that an insurance agent . . . who undertakes to procure insurance for another owes a duty to a client to use reasonable diligence in attempting to place the requested insurance and to inform the client promptly if unable to do so.").  The Texas Insurance Code requires reinsurers to "exercise due diligence in inquiring into the financial condition of the reinsurer" and to "disclose to the ceding insurer the broker's findings in connection with the inquiry." Tex. Ins. Code § 4152.152(1)-(2); ROA.52 (Pet. ¶ 78).

Gallagher did none of those things, and thus breached section 11 in multiple ways.  Gallagher did ***not*** "use reasonable diligence in attempting to place the requested reinsurance," as evidenced by the fact that it advised HOA to enter into an illusory reinsurance facility backed by a "collateral letter" from Yu Po Finance, rather than an authentic letter of credit from a qualified issuing bank.  *See* ROA.39–45 (Pet. ¶¶ 40–60).  Nor did Gallagher "inform [HOA] promptly" when it was

"unable to" obtain actual reinsurance for HOA.  ROA.52 (Pet. ¶ 78); *May*, 844 S.W.2d at 669.  Gallagher further failed to "exercise due diligence in inquiring into the financial condition of" CCB or to "disclose to [HOA] [its] findings in connection with the inquiry."  Tex. Ins. Code § 4152.152(1)-(2); ROA.52 (Pet. ¶ 78).  Gallagher breached these fundamental diligence duties by, *inter alia*, (1) failing to begin securing HOA's 2021 coverage until days before expiration of the existing policy, ROA.39 (Pet. ¶ 41), (2) failing to alert HOA that the reinsuring bank should have been changed from CCB to HSBC Bank USA, but was not, ROA.39–40 (Pet. ¶ 42–44), (3) failing to secure a valid letter of credit by the close of the transaction with Vesttoo, instead lining up a "collateral letter" from Yu Po Finance that turned out to be fraudulent, ROA.40–44 (Pet. ¶¶ 46, 56), (4) affirmatively assuring HOA that it had a legitimate letter of credit in place when all signs visible to Gallagher indicated the opposite, ROA.44 (Pet. ¶¶ 57–59), and (5) attempting to cover its tracks in the subsequent days by sending HOA a post-hoc disclaimer of any responsibility for diligence related to the transaction, ROA.45 (Pet. ¶ 61).

Gallagher does not dispute these facts—nor could it at the motion to dismiss stage—and the district court did not address these many breaches.  Instead, the court offered two reasons for its dismissal of Porch's claim for breach of section 11. ROA.668.  But both reasons miss the mark.

20

*First*, the court held that "economic" laws *cannot* include the Texas Insurance Code, because such an interpretation would "ignore other language in section 11." ROA.668. The court gestured to section 11's statement that *HOA* "should consider obtaining independent legal advice regarding applicable economic or trade sanctions laws." ROA.668. The court reasoned that, if section 11's reference to "economic" includes *Gallagher's* Insurance Code obligations, then this provision suggesting that *HOA* should seek legal advice about those obligations "makes no sense." ROA.668.

This reasoning fails. First, HOA could very well seek legal advice about the laws applicable to Gallagher, including under the Texas common law, Texas Insurance Code, and other economic laws. There is nothing nonsensical about a party assessing the scope of what its contractual counterparty is required to do under applicable laws. Regardless, Porch never argued that section 11's "economic" laws refer *only* to Gallagher's obligations under the Texas Insurance Code. The language simply *includes* those laws and Gallagher's obligations thereunder. The language also fairly encapsulates the "economic" laws applicable to HOA. So, as section 11 recognized, HOA could reasonably seek legal advice about its own "economic" legal obligations. (Those obligations are just not at issue here.) Porch's contention that "economic" laws include Texas insurance laws fully coheres with the rest of section

21

11.[5] Indeed, it is reasonable for contracting parties to agree to abide by all applicable laws in the course of their contractual relationship—and a jury could reasonably find this was what HOA and Gallagher did in section 11 of the RIAA.

*Second*, the court credited Gallagher's argument that the Texas Insurance Code "does not appear to provide a private cause of action for violations." ROA.668. But this observation—which is undisputed—is beside the point. Porch does not assert a cause of action under the Texas Insurance Code. Porch's cause of action—and the only one it needs—is for breach of contract.

As one Texas appellate court recently confirmed, a party may be liable in contract for statutory violations if, as here, those statutes are incorporated into the contract. *See Quantum Plus, LLC v. Hosp. Internists of Austin, P.A.*, No. 03-23-00263-CV, 2025 WL 420213, at *5 (Tex. App.—Austin Feb. 7, 2025, no pet.). In *Quantum Plus*, the Austin Court of Appeals affirmed a judgment for breach of a contract in which the defendant agreed to "comply with 'applicable federal, state and local statutes, rules and regulations,'" where the defendant violated a statutory prohibition on the corporate practice of medicine. *Id.* at *5, *8. The court noted that

---

[5] Gallagher argued in its motion to dismiss that section 11 referred only to "laws that govern international trade and the imposition of economic sanctions on a global scale, not state insurance codes." ROA.152. The district court did not adopt this argument, but, in any event, it is wrong. Insurance laws are fundamentally "economic" in nature. Regardless, if this language is susceptible to more than one reasonable meaning, the ambiguity must be resolved by the factfinder, not by the court on a 12(b)(6) motion to dismiss. *E.g., Stellar Restoration Servs., LLC v. James Christopher Courtney*, 533 F. Supp. 3d 394, 406 (E.D. Tex. 2021).

its "determination [was] consistent with cases from other Texas courts affirming breach of contract claims based on failure to abide by an agreement to comply with applicable laws and regulations when the defendant failed to comply with a specific, but not expressly identified, law or regulation." *Id.* at *5; *see Hancock v. Chi. Title Ins.*, No. 07-CV-1441, 2013 WL 139547, at *4–5 (N.D. Tex. Jan. 11, 2013) (ruling that a contractual provision was breached where a party violated Rate Rule R-8 of the Texas Basic Manual of Title Insurance and the contract required it to "[c]omply with all applicable laws and regulations relating to the conduct of [its] business"); *Bernard v. L.S.S. Corp.*, 532 S.W.2d 409, 410–411 (Tex. App.—Austin 1976, writ ref'd n.r.e.) (noting that a lease was breached where the tenant failed to pay certain state taxes and the contract required it to "comply with all Federal, State, Municipal, and other laws, ordinances, rules, and regulations applicable"). The existence or non-existence of a private cause of action under the Texas Insurance Code is irrelevant. A violation of the Texas Insurance Code (or the Texas common law[6]) is a breach of section 11 of the RIAA, and is actionable as a breach of contract.

Beyond the defects in the court's two stated reasons for dismissing this breach claim, the court additionally erred by ignoring a key component of Gallagher's section 11 obligations: its duties under the Texas common law. As a Texas

---

[6] The court did not address Gallagher's Texas common-law duties in assessing section 11. *See infra* pp. 23–24.

reinsurance broker, Gallagher has a common-law duty to "use reasonable diligence in attempting to place the requested reinsurance and to inform the client promptly if unable to do so." *May*, 844 S.W.2d at 669.  As Porch's complaint repeatedly alleged, Gallagher did not do so.  ROA.37–52, 55–56 (Pet. ¶¶ 31, 33, 40, 46–48, 54–72, 78, 93).  The court's conclusion that the RIAA did not require Gallagher to comply with the Texas Insurance Code says nothing about Gallagher's separate and independent breaches of its common-law duties, made actionable by section 11 of the RIAA. *Quantum Plus*, 2025 WL 420213, at *5; *Hancock*, 2013 WL 139547, at *6; *Bernard*, 532 S.W.2d at 411.

For these reasons, the Court should reverse the district court's ruling that Porch failed to allege that Gallagher breached Section 11 of the RIAA.[7]

### C. Gallagher breached section 5 of the RIAA.

The district court also erred in ruling that Gallagher did not breach section 5 of the RIAA. Under section 5, Gallagher was obligated to "[r]etain . . . [d]irectly from any assuming reinsurer, written evidence that the assuming reinsurer has

---

[7] Gallagher argued in its motion to dismiss that HOA released Gallagher of certain duties under sections 11 and 13 through a boilerplate disclosure form signed in 2022, over four years after entering the RIAA. *See* ROA.155. The district court did not adopt this meritless argument. But Porch reiterates here the many reasons why the argument fails. *See* ROA.585–88. First, the disclosure form is not part of the RIAA and indeed does not even mention it. Second, the form was merely an *ex-post* attempt by Gallagher to cover its tracks *after* it had already botched HOA's reinsurance transaction. Third, the duties addressed in the form are non-insurance diligence activities relating to financial, legal, tax, and accounting matters; the form does not release (or even relate to) Gallagher's obligations as a reinsurance broker. Fourth, the disclosure form by its own terms relates only to the 2022 QSRC, and not the separate 2023 QSRC. Gallagher breached the RIAA in connection with *both* the 2022 and 2023 QSRCs.

agreed to assume the risk." ROA.60 (Pet. Ex. A at 1 § 5). Here, it is undisputed that Gallagher did not retain ***anything*** in writing "directly from" the assuming reinsurer, China Construction Bank. *See* ROA.602  (arguing that "to the extent [it] was required to procure written evidence . . . [it] did so by retaining the QSRC from White Rock[.]"). The only writings that Gallagher retained that even *purported* to confirm that CCB had agreed to assume the reinsurance risk were the fake "collateral letter" from Yu Po Finance for 2022 and the falsified letter of credit from CCB for 2023. ROA.40–50 (Pet. ¶¶ 46, 56, 59–60, 68 & 70–72). Gallagher thus plainly breached section 5's documentation requirement by failing to retain documentation received "directly" from CCB—an "assuming reinsurer" for HOA's reinsurance facility—that established CCB's agreement to undertake the risk.

The district court gave two reasons for its dismissal of Porch's claim for breach of section 5. Neither suffices to support the ruling.

*First*, the court held that Gallagher's obligation to "retain" key documentation allowed it not to ***obtain*** the documents in the first place. ROA.664–65. This is both wrong as a matter of plain meaning and impermissible in view of the rest of section 5.

As to plain meaning, Black's Law Dictionary defines "retain" to mean, "[t]o hold in possession or under control; to keep and not lose, part with, or dismiss."

25

*Retain*, Black's Law Dictionary (12th ed. 2024).[8]  That is precisely the obligation that Porch alleges Gallagher had (and breached): "to *hold in possession*" some "written evidence" "[d]irectly from" the "assuming reinsurer" that it "has agreed to assume the risk."  *See id.*; ROA.60 (Pet. Ex. A at 1 § 5).  The only way Gallagher could "hold" such evidence "in [its] possession or under [its] control" is to obtain that evidence in the first place.  It did not secure any such evidence, and its failure to do so cost HOA millions of dollars in damages.  *See* ROA.51 (Pet. ¶¶ 76–77).

Moreover, to read this language to permit Gallagher not to obtain any documentation in the first place is to deprive section 5 of all meaning.  Section 5 does not just address proof of reinsurance that comes directly from any assuming reinsurer.  It contains a long list of documents integral to a reinsurance transaction, including "[t]he contract" itself, as well as its "limits," the "underwriting restrictions," the "[p]eriod of coverage," the "[r]ate used to compute the reinsurance premium," the "[n]ames and addresses of assuming reinsurers," and "[p]roof of placement."  ROA.60 (Pet. Ex. A at 1 § 5).  These critical documents are not materials that Gallagher simply *may or may not* have.  They are fundamental to the transaction and Gallagher's role as the reinsurance broker.  The notion that Gallagher

---

[8] The Texas Supreme Court has explained that, "[t]o determine the common, ordinary meaning of undefined terms used in contracts, statutes, and other legal documents, 'we typically look first to their dictionary definitions and then consider the term's usage in other statutes, court decisions, and similar authorities.'" *Pharr-San Juan-Alamo Indep. Sch. Dist. v. Texas Pol. Subdivisions Prop./Cas. Joint Self Ins. Fund*, 642 S.W.3d 466, 474 (Tex. 2022) (citation omitted); *see id.* (looking first to dictionary definitions).

could have disregarded its retention obligation as to this entire list of documents—including the reinsurance contract itself—on the basis that the word "[r]etain" permits it *never* to procure the very documents it must "[r]etain," contravenes the bedrock rule that courts "must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *J.M. Davidson*, 128 S.W.3d at 229 (citation omitted).

*Second*, the district court appeared to adopt Gallagher's argument that it did not need to retain anything "directly from" China Construction Bank, because "any assuming reinsurer" does not include CCB, and instead refers *only* to White Rock. *See* ROA.665–66; *see also* ROA.150–51 (making this argument)); ROA.600–02 (same). This argument fails, as CCB is straightforwardly included among "*any* assuming reinsurer." In HOA's collateralized reinsurance arrangement, the entity "assuming" the "risk" was, without question, the bank issuing the letter of credit, CCB. In a major claims event, the letter of credit funds would be drawn down and *CCB*—not White Rock—would pay money to reinsure HOA. As Porch alleged, "*China Construction Bank* was responsible for providing hundreds of millions of dollars *in reinsurance funds* to HOA under the [QSRC] that Gallagher negotiated."

27

ROA.55 (Pet. ¶ 91 (emphasis added)).[9]  The reinsurance "risk" was "assum[ed]" by CCB—making it an "assuming reinsurer" under section 5.

Lest there be any doubt, the contract uses the word "***any***," emphasizing that section 5 expansively refers to ***any*** entity undertaking the reinsurance risk.  It does not refer, as Gallagher contends, exclusively to White Rock.  *See* ROA.150–51.  Because CCB was ***an*** entity ***assuming reinsurance risk***, and was thus "***any assuming reinsurer***," Gallagher had a contractual duty to secure confirmation "[d]irectly" from CCB that it had in fact assumed the risk.  Any reasonable factfinder would see that the entire point of Gallagher's obligation to do this was to confirm that ***any*** entity responsible for paying millions of dollars to provide reinsurance in a major claims event had in fact agreed to do so.

The district court did not address these points and instead asserted that interpreting "any assuming reinsurer" to refer to CCB would be "inconsistent with [Porch's] pleadings."  ROA.665.  The court then cited certain language from Porch's

---

[9] The district court stated that, while Porch argued in its response to the motion to dismiss that the QSRC cannot inform the meaning of the contract, it "relied on the opposite argument" elsewhere, by asserting that "that the QSRC reflected that China Construction Bank qualified as an 'assuming reinsurer.'"  ROA.666 n.5.  There is no inconsistency in Porch's arguments.  In opposing Gallagher's motion to dismiss, Porch made the limited point that Gallagher could not import the defined term "Reinsurer" from the QSRC into the RIAA to change the meaning of "reinsurer" in the RIAA, because the RIAA predates the QSRC by five years.  ROA.581.  By contrast, Porch's allegation in its complaint that the QSRC shows that CCB is an assuming reinsurer is not an attempt to redefine the word "reinsurer."  It is instead a simple observation that CCB was the entity that in fact underwrote the relevant risk.  ROA.50–51 (Pet. ¶¶ 75–77).  These propositions are not "opposite[s]."

complaint, where CCB was listed separately from "the reinsurers" or "the reinsurance counterparties." ROA.665 (citing Porch's reference in its complaint to "the reinsurers _or_ China Construction Bank" and its reference to "White Rock and Vesttoo" as "the reinsurance counterparties").

In construing these non-substantive features of Porch's complaint as **_admissions_** that the contract held a certain meaning, the court not only resolved inferences against Porch and failed to view the allegations in the light most favorable to Porch as the nonmovant, _see, e.g._, _Gonzalez v. Kay_, 577 F.3d 600, 603 (5th Cir. 2009), but it also ignored Porch's detailed arguments in its opposition to Gallagher's motion to dismiss. Porch explained at length in its response why the phrase "any assuming reinsurer" includes CCB, as the party that in fact underwrote the reinsurance risk. ROA.580–81. The court did not engage with those points and instead construed the contract based on out-of-context, non-substantive verbiage from the complaint. The court's reasoning here was erroneous. Moreover, that language that could have readily been amended if the court indeed found it fatal to Porch's claim. _See infra_ Part II.

Critically, even if reasonable minds might disagree on whether the RIAA's obligation that Gallagher "retain" documentation includes an obligation to "obtain" that documentation, or whether "any assuming reinsurer" includes China Construction Bank, there is at least ambiguity warranting resolution by the

factfinder. *See Stellar Restoration Servs., LLC v. James Christopher Courtney*, 533 F. Supp. 3d 394, 406 (E.D. Tex. 2021) (denying a motion to dismiss because "the meaning of the Agreement is ambiguous," and "[d]etermining the parties' intent is a question of fact better addressed at a later stage of litigation"); *Decorative Ctr. of Hous., L.P. v. Direct Response Publ'ns, Inc.*, 208 F. Supp. 2d 719, 732 (S.D. Tex. 2002) (denying a motion to dismiss a breach of contract claim because the ambiguity in the contract "most likely will need to be addressed at trial"); *see also R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 519 (Tex. 1980) (noting that, even when "extraneous evidence is admissible to determine the true meaning of [an ambiguous] instrument," even "summary judgment based on such a record" is normally "improper"). The district court thus committed a legal error when it construed these terms as a matter of law *against* Porch as the nonmovant on a motion to dismiss.

Accordingly, this Court should reverse the district court's ruling that Porch failed to allege that Gallagher breached section 5 of the RIAA.

\* \* \*

The district court's dismissal of Porch's claim for breaches of the RIAA resulted from improper 12(b)(6) reasoning and erroneous contract interpretation. Its ruling should be reversed and the case remanded for further proceedings. *See Molzan*, 112 F.4th at 335 (reversing the district court's dismissal of a Texas breach

of contract claim and remanding for further proceedings); *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 561, 567 (5th Cir. 2002) (same).

## II.    The district court erred in *sua sponte* denying Porch leave to amend.

After ruling that all of Porch's claims should be dismissed, the district court *sua sponte* ruled that Porch would not be given even one opportunity to amend its original complaint.  At the end of its order, the court criticized Porch for "standing on its pleadings" rather than explicitly requesting leave to amend its complaint in its opposition to the motion to dismiss.  ROA.673.  The court then swiftly entered final judgment and closed the entire case that evening.  ROA.675.

This was an error.  The Federal Rules are clear that "[t]he court should freely give leave when justice so requires."  FED. R. CIV. P. 15(a)(2).  This is especially so when a plaintiff has not yet amended its complaint even once.  As this Court has explained, "[i]n view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford plaintiffs **at least one opportunity** to cure pleading deficiencies before dismissing a case."  *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) (emphasis added).  This holds true "unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Id.*

Here, leave to amend should have been granted. While Porch did not expressly request leave to amend in opposing Gallagher's motion to dismiss, it certainly did not "advise the court that [it is] unwilling or unable to amend in a manner that will avoid dismissal." *Id.* Nor is there any reason to surmise that any "defects" are "incurable." To the contrary, amendment could have resolved at least some of the court's apparent concerns with Porch's complaint. For example, as to section 5, the court held that Porch's position that CCB was an "assuming reinsurer" was "inconsistent with its pleadings," citing certain verbiage from the complaint. *See supra* Part I.C. This language—apparently dispositive for the court—could have easily been amended. There was no art to Porch's references in the complaint to "the reinsurers" or "the reinsurance counterparties," nor the separate enumeration of CCB with respect to those terms. Quite simply, Porch did not anticipate at the pleadings stage that Gallagher would take the position that CCB, the entity purportedly assuming the reinsurance risk, did not qualify as "any assuming reinsurer" under the RIAA. Amendment would answer this concern, and should have been freely granted.

While this Court should reverse on the merits, as the district court's 12(b)(6) dismissal was erroneous for the reasons given, it should minimally reverse the district court's *sua sponte* ruling that Porch may not amend its complaint even once, and remand with instructions that Porch be granted leave to amend.

## CONCLUSION

For the foregoing reasons, the Court should reverse and remand for further proceedings.

Dated: June 16, 2025

Respectfully submitted,

*s/ Stephen Morrissey*
Stephen E. Morrissey
Kemper P. Diehl
Susman Godfrey LLP
401 Union Street, Suite 3000
Seattle, WA 98101

Allen J. Hernandez
Daniel Wilson
Susman Godfrey LLP
1000 Louisiana St., Suite 5100
Houston, TX 77002

*Counsel for Appellant Porch.com, Inc.*

# CERTIFICATE OF SERVICE

I certify that on June 16, 2025, the foregoing document was served on the

following parties and their counsel through the Court's electronic filing service:

Counsel for Gallagher Re, Inc.:
Deanne C. Ayers
Ayers & Ayers
4205 Gateway Drive, Suite 100
Colleyville, TX 76034

*s/Stephen Morrissey*

# CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5TH CIR. R. 32.1, this document contains 8,258 words.

2.      This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5TH CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface in Times New Roman, font size 14, using Microsoft Word.

*s/Stephen Morrissey*